***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Chief Deputy Commissioner Gheen. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award except for minor modifications; therefore, the Full Commission AFFIRMS the Opinion and Award of the Deputy Commissioner.
 FINDINGS OF FACT a. Procedural History
1. On March 19, 1997, the plaintiff, James L. Harmon (hereinafter "Harmon"), filed a Form 18B with the Industrial Commission.
2. As a result of Harmon's Form 18B filed on March 19, 1997, a mediated settlement conference was held on August 2, 2000.
3. At the mediated settlement conference on August 2, 2000, the parties entered into an agreement to compromise and settle Harmon's claim. The parties prepared and executed a Compromise Settlement Agreement and Release (hereinafter "CSA") consistent with the agreements reached at the mediated settlement conference.
4. The CSA was submitted to the Industrial Commission. Special Deputy Commissioner Ronnie Rowell (now Deputy Commissioner) entered an Order Approving the Compromise Settlement Agreement and Release on September 8, 2000. The defendants, Ball Incon Glass Packaging (hereinafter collectively "Ball"), issued payment to Harmon in a total amount of $134,500.00.
5. On November 15, 2002, Harmon filed another Form 18B. This Form 18B included a letter from Dr. Arthur Frank of the University of Texas Health Center which noted an opinion, based upon a review of medical records, that Harmon suffered from asbestosis and lung cancer caused by asbestos exposure and cigarette smoking.
6. On January 7, 2003, Ball and Travelers filed a Form 61 denying Harmon's claim and contemporaneously filed a Motion to Dismiss with Prejudice. On January 15, 2003, Ball and AIG filed a Form 61 denying Harmon's claim and contemporaneously filed a Motion to Dismiss with Prejudice. On June 12, 2003, Ball and Gates-McDonald filed a Motion to Dismiss with Prejudice. Harmon filed a reply to the various Motions on April 8, 2003.
7. On April 30, 2003, Executive Secretary Tracey Weaver issued an Administrative Order referring this matter to the Deputy Commissioner Section of the Industrial Commission to schedule a hearing on the Motions to Dismiss.
 b. Settlement Agreement
8. The CSA approved by the Industrial Commission on September 8, 2000 is incorporated herein by reference as if fully set out.
9. The CSA contains a provision (emphasis added) on page one that notes Harmon alleged contracting "anoccupational disease or diseases, that being asbestosisand chronic obstructive pulmonary disease, as well asother associated lung and pulmonary disorders, such asbronchitis and pneumonia[.]" The parties specifically included that Harmon had:
a. a history of exposure to asbestos and titanium tetrachloride;
b. a medical history of dyspnea and pneumonia; and
c. a history of smoking two to two and one-half pacts of cigarettes daily, an addiction developed in his mid-twenties.
10. Prior to the execution and approval of the CSA, Harmon was diagnosed with chronic obstructive pulmonary disease, asbestos associated pleural plaques and possible asbestosis. Harmon was advised to undergo a high-resolution CT scan, stop smoking and take various mediations.
11. The CSA contains, among others, these provisions that define the extent of the release of Harmon's rights to future recovery under the North Carolina Workers' Compensation Act (hereinafter "Act") (emphasis added):
 Employer will pay and Employee will accept the sum . . . in full, final, and complete compromise settlement of any and all claims for compensation past, present, and future, including, without limitation, any claim for change of condition under G.S. § 97-47 which Employer [sic] now has or may hereinafter have against Employer under the North Carolina Workers' Compensation Act arising out of or in any way causally related to said injury by accident or occupational disease . . .
 Employee, in consideration of said payments, hereby releases, acquits, and forever discharges Employer . . . from all claims and demands for compensation . . . and all other claims and demands for benefits or payments of every kind under the North Carolina Workers' Compensation Act, on account of or in anyway growing out of any and all known and unknown injuries or physical defects which Employee now has or may hereafter have as a result of his alleged . . . occupational disease or diseases which might have occurred on or about Employee's last day of employment. . . .
 IT IS UNDERSTOOD by and between the respective parties hereto that Employee's condition as the result of his alleged . . . occupational diseases or diseases may be permanent and may be progressive and . . . it is understood that the sum of money here paid is in full and final settlement of all claims of Employee against Employer under the North Carolina Workers' Compensation Act, growing out of said condition or any change in or progression of any condition which might in the future develop . . .
 IT IS FURTHER UNDERSTOOD that the rights and remedies of Employee . . . which are governed and controlled by the North Carolina Worker's Compensation Act, are now being compromised, adjusted, and forever foreclosed.
 IT IS FURTHER UNDERSTOOD by Employee that in making this Agreement and Release . . . the facts in connection with . . . his resulting injury and impaired physical condition are fully known, understood and comprehended by him, and that his rights under the North Carolina Workers' Compensation Act have been fully explained to him by his own private counsel.
 c. Medical Evidence
12. Dr. John Craighead (hereinafter Dr. Craighead) testified as an expert witness in the present controversy. He is imminently qualified as an expert in pathology with a concentration on asbestos-related diseases based upon his education, distinguished career and extensive array of peer review publications.
13. Dr. Craighead's testimony establishes three main diseases that can be caused by exposure to asbestos fibers: asbestosis, lung cancer and mesotheliolma.
14. Asbestos exposure is not the same thing as asbestosis and, in fact, asbestos exposure rarely leads to asbestosis unless exposure is heavy.
15. Asbestosis is a "widespread, diffuse scarring disease of the lungs characterized by interstitial fibrosis that develops consequent to repeated and prolonged exposures to very high concentrations of asbestos in the environment, customarily the work environment." The distinguishing characteristic of the disease asbestosis is interstitital fibrosis. Interstitial fibrosis is a condition in which the walls of the small airways undergo scarring causing the walls of the airways to become thickened by the accumulation of fibrous tissue, or scar tissue.
16. When lung tissue is bombarded by low doses of asbestos fibers, or other irritating dusts, the lungs have a natural inflammatory response that eliminates the irritant. When heavy exposures occur, the lung tissues respond with a "very striking" inflammatory response that at the end is insufficient to inactivate the irritating substances. The result is damage to lung tissue in the "accumulation of scars that ultimately impede function of the lungs that are sufficiently thick to cause the radiological changes" and fibrotic tissue. The initial inflammatory response, which does not cause scarring, does not meet the clinical criteria of asbestosis.
17. Lung cancer is the development of malignant cells from the cells that line the respiratory tract or bronchi, "very strongly associated with cigarette smoking."
18. Dr. Craighead addressed the relationship between asbestos, cigarette smoking and the disease lung cancer. Asbestos fibers are "promoters" contributing to the cancer. After exposures to high concentrations of asbestos, in sufficient concentrations to result in the occurrence of asbestosis, an increased incidence of lung cancer results. Stated differently, when exposure to asbestos is extremely heavy, sufficient to result in asbestosis, that asbestos promotes the development of lung cancer that is caused by smoking.
19. In the absence of asbestosis, the prevalence of lung cancer in the working population is no different than in the general population. When asbestosis occurs there is an increased prevalence of lung cancer, specifically squamous cancer. Dr. Craighead's testimony establishes that the diagnosis of the disease asbestosis is a "good marker of heavy exposure to asbestos" sufficient to conclude the asbestos played a role in the development of lung cancer.
20. In regard to the present controversy, Dr. Craighead specifically opined that if Harmon had the disease asbestosis and squamous cell carcinoma, an association would exist that asbestos contributed to the development of Harmon's lung cancer. The opposite conclusion is also true as the absence of asbestosis would negate causation. The asbestos in and of itself, when bombarding the walls of the airways where cancer develops, stimulates mitotic activity, that is the asbestos particles stimulate the cells in a very specific way causing what is known as squamous metaplasia. Metaplasia is one step on the way to carcinogenesis. Squamous metaplasia, the increased proliferation and the differentiation of the cells, mark the beginning of a process that is not in itself malignant but in association with cigarette smoke tars develops cancer.
21. Dr. Craighead testified that squamous carcinoma would be an "associated condition with" asbestosis and Chronic Obstructive Pulmonary Disease (Hereinafter "COPD"). He admitted, however, that the "associations" between the diseases "are epidemiological associations" only. The "association" is not causal but reflects that asbestosis is a marker for heavy enough asbestos exposure for there to be an increased risk of lung cancer due to asbestos interacting with cancerous cells.
 d. Operative Findings of Fact
22. Dr. Craighead's testimony establishes squamous cell carcinoma, from which Harmon suffers, is a condition associated with asbestosis and COPD even though asbestos does not, in and of itself, cause squamous cell carcinoma. It is a promoter substance, promoting the development of squamous lung cancer in persons who smoke.
23. The CSA Harmon executed contained a recitation that two of three examining physicians believed that Harmon had "possible asbestosis." The CSA accurately recounted that Harmon has a history of heavy cigarette smoking.
24. Harmon had not been diagnosed with squamous cell carcinoma prior to the execution of the CSA and no evidence exists that he had contracted squamous cell carcinoma on the date the CSA was executed.
25. It is common knowledge in the general public that cigarette addiction is associated with lung cancer.
 e. Ball's Petition For Attorney Fees
26. Ball's counsel filed a Motion For Costs on February 17, 2004 in relation to the cancellation of a scheduled deposition of Dr. Andrew Ghio (hereafter "Dr. Ghio") on February 10, 2004.
27. On February 6, 2004, four days prior to Dr. Ghio's deposition, the parties had discussed whether or not the deposition should be postponed in order to secure the transcript of another expert witness. No final decision was made at that time.
28. On February 9, 2004, Ball's counsel received a "rough" copy of the deposition that counsel had discussed on February 6, 2004. Ball's counsel contacted opposing counsel's office to request a copy of Dr. Ghio's expert qualifications and directions to opposing counsel's office. Dr. Ghio's statement of qualifications was not immediately available, but delivery was promised upon receipt. No indication was given that Dr. Ghio's deposition would be postponed or canceled.
29. Ball's counsel left Asheville by motor vehicle at approximately 10:00 a.m. on February 10, 2004 to travel to opposing counsel's office in Durham, North Carolina. At approximately 12:10 p.m., as counsel reached Winston-Salem, he received a message that Dr. Ghio's deposition had been canceled by opposing counsel.
30. Ball's counsel asserts that he immediately called opposing counsel who informed him that:
a. she had canceled Dr. Ghio's deposition;
b. she had done so after speaking with Dr. Ghio and learning he had not received a "package of information" she had previously sent him; and
c. she reflected on previous expert testimony already taken by deposition.
31. Ball's counsel has provided an affidavit indicating that he expended six and nine tenths hours in preparation for Dr. Ghio's deposition, four hours traveling to and from Winston-Salem and three hundred two miles in travel.
32. Harmon's counsel asserts that the decision to cancel Dr. Ghio's deposition was based on her realization that Dr. Ghio's testimony would have been duplicative of Dr. Craighead's expert testimony and the fact that Dr. Ghio had not received a package of information from her that had been transmitted on January 29, 2004.
33. Harmon's counsel indicates that she was unable to contact Dr. Ghio until the date of the deposition, noting that two of the four days between Dr. Craighead's deposition and Dr. Ghio's scheduled deposition included a weekend.
34. Harmon's counsel does not contend that beyond the discussion of the previous week with Ball's counsel that she attempted to notify Ball's counsel that she had been unable to reach Dr. Ghio or anticipated that the deposition might yet be canceled.
 f. Harmon's Petition For Attorney Fees
35. Harmon contends that Ball should pay his reasonable attorney fees because, while Balls' Motions to Dismiss was based in part on a straightforward argument regarding construction of the CSA, a significant portion of their defense turned upon the assertion that asbestosis causes lung cancer. Harmon asserts that if Ball's counsel had investigated the medical evidence prior to filing the Motion to Dismiss, Ball's counsel could not have reasonably advanced this issue.
36. Ball's defense of this action was reasonable as Ball negotiated the CSA in good faith and the defense that the language of the CSA precludes Harmon's present action has been successful.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. A compromise and settlement agreement terminating or purporting to terminate a controversy is a contract, to be interpreted and tested by established rules relating to contracts. Harris v. Ray Johnson ConstructionCo., Inc., 139 N.C. App. 827, 534 S.E.2d 653 (2000).
2. The principal objective in the interpretation of a contract is to ascertain the intent of the parties. Holshouser v. Shaner Hotel Grp. Props.One, 134 N.C. App. 391, 397, 518 S.E.2d 17, 23 (1999), aff'd per curiam,351 N.C. 330, 524 S.E.2d 568 (2000). The intent of the parties is ascertained "by construction of the `terms of the contract as a whole, construed in the light of the circumstances under which it was made and the apparent purpose that the parties are trying to accomplish.'" Lane v.Surety Co., 48 N.C. App. 634, 639, 269 S.E.2d 711, 714-15 (1980), disc.review denied, 302 N.C. 219, 276 S.E.2d 916 (1981). In interpreting the CSA in the present controversy, these additional principles offer guidance:
a. Where the language of a contract is "clear and only one reasonable interpretation exists, the courts must enforce the contract as written. . . ." Woods v. Nationwide Mut. Ins. Co., 295 N.C. 500, 506, 246 S.E.2d 773,777 (1978). Furthermore, "Where the language of a contract is plain and unambiguous, construction of the agreement is a matter of law; and thecourt may not ignore or delete any of its provisions, nor insert words into it, but must construe the contract as written, in light of the undisputed evidence as to the custom, usage and meaning of its terms."First Citizens Bank Trust Co. v. McLamb, 112 N.C. App. 645, 649-50,439 S.E.2d 166, 169 (1993). Since the objective of construction is to ascertain the intent of the parties, the courts should resist piecemeal constructions and should, instead, examine each provision in the context of the contract as a whole. Blake v. Insurance Co., 38 N.C. App. 555,248 S.E.2d 388 (1978) (interpreting an insurance policy).
b. Where a contract defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the contract are to be harmoniously construed, and if possible, every word and every provision is to be given effect. Gaston County Dyeing Machine Co. v. Northfield Ins. Co.,351 N.C. 293, 524 S.E.2d 558 (2000).
3. When viewed in its entirety and in accordance with the above-stated principles of contract interpretation, the plain language of the terms of the CSA provides that the parties' intended for Harmon to release all claims associated or connected with the identified conditions of asbestosis and COPD in exchange for the agreed upon compensation.
4. Ball's Motion to Dismiss tests the legal sufficiency of Harmon's claim and, in order to withstand such a motion, circumstances from which the claim arises and allegations which are sufficient to satisfy substantive elements of some recognized claim must be evaluated as the question is whether, as a matter of law, Harmon's allegations, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory. This test is consistent with the North Carolina Rules of Civil Procedure, N.C. Gen. Stat. § 1A-1. Even though the Rules of Civil Procedure are not directly applicable to Workers' Compensation actions, they offer guidance. Harvey v. Cedar Creek BP, 149 N.C. App. 873,562 S.E.2d 80 (2002).
5. A fair construction of the CSA executed by Harmon compels a conclusion that Harmon's current claim is barred by the CSA previously executed. The evidence compels a conclusion that Harmon had "possible asbestosis" and assumed the risks associated with settling his action against Ball as asbestosis in conjunction with cigarette smoking results in squamous cell carcinoma and is an "associated lung and pulmonary disorder" provided for in the CSA. The CSA specifically provides that Harmon "releases . . . [Ball] from all claims . . . for benefits . . . of every kind under the North Carolina Workers' Compensation Act, on account of or in any way growing out of any and all known and unknown injuries orphysical defects which [Harmon] now has or may hereafter have as theresult of his . . . occupational disease or diseases which might have occurred on about [Harmon's] last day of employment . . ." In addition, the parties specifically provided that they understood the "occupational disease or diseases may be permanent and may be progressive . . . [and] that it is understood that the sum . . . paid is in full and final settlement of all claims . . . under the North Carolina Workers' Compensation Act, growing out of said condition or any change in orprogression of any condition which might in the future develop." In sum, Harmon released Ball from both known and unknown injuries and defects that might later arise in which asbestos or asbestosis was a contributing factor. E.g. I.C. No. 849455, Fred H. Guerin, Employee, Plaintiff V. Sodyeco (Formerly Known As Martin Technologies And Martin Marietta), Employer, Travelers Insurance, Liberty Mutual Insurance And Home Indemnity Insurance, Carrier, Defendants. (Filed March 27, 2002) (asbestosis is a contributing factor of lung cancer in conjunction with a habit of cigarette abuse).
6. Harmon's contentions that a "settlement agreement" can only settle claims that have actually been asserted and that Harmon had not asserted his present claim for lung cancer as he had not been diagnosed with the condition and therefore he is not precluded from bringing the present action is not well taken. Harmon cites the Court of Appeals decision inLittle v. Penn Ventilator Co., 75 N.C. App. 72, 330 S.E.2d 276 (1968) (laceration of eye presenting danger or future additional permanent injury cannot be basis of claim for additional benefits). The Court of Appeals decision in Little was not decided in the context of a settlement agreement. Second, the Supreme Court review of the Court of Appeals decision in Little suggests a different interpretation of the law. Littlev. Penn Ventilator Co., 75 N.C. App. 72, 330 S.E.2d 276 (1985), affirmedin part and reversed in part, 317 N.C. 206, 345 S.E.2d 204 (1986).
7. Res judicata precludes relitigation of final orders of the Full Commission and orders of a Deputy Commissioner, which have not been appealed to the Full Commission. The essential elements of res judicata
are: (1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in the prior suit and the present suit; and (3) an identity of parties or their privies in both suits. Bryant v.Weyerhaeuser Co., 130 N.C. App. 135, 138, 502 S.E.2d 58, 61, disc.rev. denied, 349 N.C. 228, 515 S.E.2d 700 (1998) (citation omitted). The Industrial Commission entered an Order in Harmon's case that became final between the identical parties involving the same issues. Harmon is prohibited from relitigating the issues finally determined by the Industrial Commission in its Order dated September 8, 2000 including Harmon's claim for compensation related to his squamous cell carcinoma alleged in this workers' compensation action.
8. Ball's Motion for Costs for opposing counsel's untimely cancellation of Dr. Ghio's deposition, while not in keeping with the highest tradition of communication and coordination between counsels in workers' compensation cases, is not subject to sanction absent specific authorization. The Full Commission sanctioned an attorney $700.00 for the cancellation of a deposition under circumstances even more compelling that in the current case. I.C. No. 815591, Charles L. McKoy, Employee, Plaintiff v. City Of Dunn, Employer, Self-Insured (Zenith Insurance Company, Third-Party Administrator), Defendant. (Filed September 13, 2000.) (hereinafter "McKoyI"). The Court of Appeals, in an unpublished decision, reversed the imposition of sanctions for the cancellation of the deposition. McKoy v.Dunn, 147 N.C. App. 524, 558 S.E.2d 261 (2001) (unpublished). As the Full Commission noted upon the remand of the Court of Appeals in McKoy I:
 "In accordance with the Court of Appeals Opinion in this case certified to the Commission on December 27, 2001, though plaintiff's attorney's conduct was unreasonable, inexcusable and undermines the good working relations between opposing counsel which thereby negatively impacts on the Commission's workload, the Commission may not sanction a party without a violation of a specific rule."
The Commission has heretofore seen no need to promulgate a rule governing common courtesy among counsel. Therefore, defendant is not entitled to recover costs and attorney fees associated with the depositions scheduled on March 10, 1999. I.C. Rule 612. I.C. No. 815591, Charles L. McKoy, Employee, Plaintiff v. City Of Dunn, Employer, Self-Insured (Zenith Insurance Company, Third-Party Administrator), Defendant. (Filed April 30, 2002) (hereinafter "McKoy II"). The reasoning of McKoy II is equally applicable to the facts of this case. It should be noted that cancellation of depositions in the context of civil actions apparently became sufficiently problematical that the adoption of a specific rule to address the problem:
 If the party giving the notice of the taking of a deposition fails to attend and proceed therewith and another party attends in person or by attorney pursuant to the notice, the judge may order the party giving the notice to pay such other party the reasonable expenses incurred by him and his attorney in attending, including reasonable attorney's fees. N.C. Gen. Stat. § 1A-1, Rule 30.
The Industrial Commission Rules contain no such corresponding provision.
9. Harmon's Motion For Sanctions must be denied, as Ball's defense of this action is not unfounded or litigious. N.C. Gen. Stat. § 97-88.1.
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission AFFIRMS the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Harmon's claim is hereby DISMISSED WITH PREJUDICE.
2. Each party shall bear their own costs.
This the ___ day of January 2005.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
DISSENTING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER